# JOHN S. ALEXANDER et al. *vs.* MARYLAND TRUST CO.

*Compromise of Claims—Consideration—Right of Receiver to Make Compromise—Intervening in Equity Suit After Adjudication*

If a claim for a sum of money alleged to be due by a third person is assigned to one who believes it to be valid, and the assignee agrees with debtor to give up his right to demand certain property upon the faith of the debtor's promise to pay such claim, then the question whether the money claim was originally valid or not is immaterial, and the surrender by the assignee of his right to the property is a consideration for the promise to pay the claim.

A receiver has the right, with the sanction of the Court, to make contracts for the compromise of claims and suits relating to the property there being administered.

In such case it is not necessary that previous notice be given to the company whose affairs were in the hands of the receiver and which assented to the sale of its property.

A party who knows that the question of the ownership of property, to which he has a claim as assignee, is being litigated, but who does not appear until after the question has been decided against him, is not entitled as of right to intervene then and take testimony, but the matter is within the discretion of the trial Court.

If a party to an equity cause, where a fund is to be distributed, is made to believe by the conduct of other parties that no objection will be made to his claim, and for that reason, fails to produce certain testimony, the Court should see that he is not thereby prejudiced.

M., the holder of a concession for building a railroad in Mexico, agreed that A., who aided him in promoting the affair, should be entitled to a certain share of whatever profits might be realized. The concession and the rights of M. were assigned to a trust company, which agreed to protect A.'s right. The trust company executed an agreement by which one-fourth of the common stock of the railroad company was allotted to M. as his share of the profits. The agreement also admitted that the railroad company was indebted to M. in the sum of $55,000, for money advanced, and the trust company agreed to pay the same from the sale of the securities. M. afterwards became largely indebted to the company. The trust company was subsequently put in the hands of a receiver by a decree of an equity Court. A. intervened in the cause, claiming his share of the stock allotted M. The Court ratified an agreement between A. and the receiver by which the former gave

up his claim to the stock and the receiver agreed to pay to A. whatever sum should be payable as a dividend on M.'s claim of $55,000, against the railroad company, and the receiver was to set off the claim of the railroad company against M. in extinguishment of the latter's claim to that sum and to assign to A. the claim of the trust company against M. The receiver sold the railroad, and upon the distribution of the proceeds, the trust company alleged that the original claim of M. to the $55,000 was invalid, and that consequently A. was not entitled to a dividend on that sum. *Held*, that under these circumstances, the validity *vel non* of the original claim does not affect the agreement between the receiver and A. since A. acted in good faith and surrendered his claim to the share of stock in the consideration of the dividend on the $55,000, and not merely for the personal decree against M., and that consequently A. is entitled to the dividend without any deduction on any account of M.'s indebtedness to the trust company.

*Decided May 15th, 1907.*

Appeal from the Circuit Court No. 2, of Baltimore City (DOBLER, J.)

The cause was argued before BOYD, PEARCE, SCHMUCKER and BURKE JJ.

*John S. Wise* and *Chas. McH. Howard* (with whom were *Venable & Baetjer* on the brief), for John S. Alexander, appellant.

*R. B. Tippett*, for A. A. Alexander, appellant.

*J. Southgate Lemmon* and *C. Baker Clotworthy*, for the appellee.

BOYD, J., delivered the opinion of the Court.

There are three appeals in this record—two by John S. Alexander and one by Archibald A. Alexander—but it will be unnecessary to discuss them separately, in view of the conclusions we have reached. Although the record contains nearly five hundred pages and the briefs over two hundred, the principal questions in controversy are comparatively simple, after they are separated from those which have no bearing on these appeals. It will, however, be well to state at

some length the facts leading up to the order and decree appealed from, as they will tend to explain and throw light upon the true situation and rights of the respective parties, so far as necessary for the purposes of this case.

The Mexican Government granted a concession for the building of the Vera Cruz and Pacific Railroad, by which, in addition to the right to construct and operate the road, a subsidy in bonds of the Government was granted at the rate of $16,000 (Mexican) per kilometre, payable in installments as the road was completed. The length of the road as projected was 350 kilometres (about 220 miles). Messrs. Reed and Campbell originally held the concession. John S. Alexander entered upon negotiations for the control of it and Alfred Bishop Mason became jointly interested with him in the project, upon the representation of the latter that he would procure the assistance of the Maryland Trust Company in constructing the road. Prior to May 3rd, 1898, whatever understanding existed between Mason and Alexander was in parol, but on that date an agreement in writing was entered into between them. It recited that Mason had purchased from V. R. Reed a concession bearing date February 28th, 1898, issued to him by the Government of the United States of Mexico, which concession had been assigned to Mason and Henry J. Bowdoin, and which Mason had agreed to assign to the Vera Cruz and Pacific Railroad Company. It further recited that Alexander aided in the promotion of the undertaking, and had agreed to render such service thereafter, under the direction of Mason, as he might request, upon an agreement for compensation out of the net proceeds of the undertaking. It was then agreed by Mason that upon the completion of the contracts of subscription and construction he would pay Alexander for such services "four-ninths of such part of the net profits accruing from said contracts as the said Mason may retain for his own use and benefit, which payment shall be made by the transfer and delivery of four-ninths of such net profits in the form in which they may be when ascertained * * * that is to say, in stocks, bonds or notes of said com-

pany or in cash profits." Alexander agreed to accept the four-ninths "and does not and will not claim any interest in said concesion or any interest in, nor control over, the undertaking except the right to receive the four-ninths of the net profits as above provided." It was provided that nothing in the contract should prevent Mason from dealing with the undertaking as his own property, or from cancelling existing contracts with the Railroad Company and with others, or from making such other contracts as he might see fit. The agreement was also stated to be in full settlement of all questions existing between them prior to that date, and in final determination and definition of their respective rights.

That agreement was drawn by Henry J. Bowdoin, who was Vice-President of the Maryland Trust Company, and was executed in triplicate—each of the parties and the Trust Company retaining a copy. Alexander testified that Bowdoin "undertook to give" him notice of any changes in the contract between the Trust Company and the Railroad Company that might be made at any time thereafter. On January 17th, 1900, J. Bernard Scott, Secretary of the Trust Company, wrote to the counsel for Alexander; "Should there remain in our hands to the credit of Mr. Mason any net profits, as defined and set forth in the agreement of May 3rd, 1898, we will, before turning same over to Mr. Mason, notify Mr. Alexander and give him an opportunity to assert his claim for his share in the same." In the petition of the receiver, to be hereinafter more particularly referred to, asking of the Court authority to settle with Alexander, he said, in speaking of the contract of May 3rd, 1898, "The Maryland Trust Co. was notified of this contract between Alexander and Mason and Mr. Henry J. Bowdoin, the vice-president of said Trust Company, and acting on its behalf promised the said Alexander that the Trust Company would see that four-ninths of any profits that might be coming to Mason should be retained for his benefit."

Certain arrangements were made between Mason, the Railroad Company and the Trust Company and the latter advanced from time to time large sums of money. Alexander claims to

have been kept in the dark, and evidently was not fully informed as to what was being done between those parties. The Railroad Company was organized under the laws of West Virginia, and in April, 1901, a new arrangement was entered into between the Trust Company, the Railroad Company and Mason without the knowledge of Alexander. An agreement was entered into between the Trust Company and Mason on April 11th, 1901, which recited the holdings of stock and promissory notes of the Railroad Company by Mason, which were held by the Trust Company as collateral security for the indebtedness of Mason, and by which it was agreed that the Trust Company should vote the stock as the agent and attorney of Mason at the meetings of the Railroad Company, in order that new contracts between Mason and the Railroad Company could be entered into. On the next day (April 12th, 1901,) another agreement was made between the Trust Company and Mason which recited that by the agreement of April 11th, it was provided that the Railroad Company was to be capitalized at $5,000,000 first mortgage five per cent. American gold bonds, $2,500,000 first preferred stock, $2,500,000 second preferred stock and $5,000,000 common stock, to be issued under the terms of a contract to be entered into between Mason and the Railroad Company. Mason then covenanted to deliver to the Trust Company the bonds, the first and second preferred stock and $3,750,000 of the common stock, in consideration of which the Trust Company agreed to release him from all indebtedness or liability to the Trust Company, together with interest thereon, existing at that date, as well as all indebtedness to the associates of the Trust Company under syndicate agreements entered into with Mason. That agreement provided for the sale by the Trust Company, or hypothecation as collateral security, of the subsidy bonds of the Government of Mexico, issued on account of the reconstruction and equipment of the Motzorongo Road, and the construction and equipment of the Vera Cruz and Pacific Railroad and its branches, and it was agreed that Mason should receive a salary as President of the Railroad Company,

of $20,000 in gold for the twelve months succeeding the first day of April, 1901.

That the $1,250,000 of common stock was allotted to Mason as his share of the profits is shown by what is called "Declaration of Trust and Agreement" which was executed by the Trust Company, through its attorney, Mr. Marbury, and by Mason on March 14th, 1902. That is also so stated in the petition of the receiver, which said that he was advised that Alexander was not notified by the Trust Company that said allotment had been made. The Declaration of Trust is quite a lengthy instrument. It recites that in addition to the proceeds of sales of the subsidy bonds the Trust Company had made large advances towards the construction, operation and maintenance of the railroad, and might advance additional amounts for the same or similar purposes; that Mason claimed to be a creditor of the Railroad Company in the sum of $55,000 gold, for money advanced by him at various times, also in the sum of $584,122.94 (Mexican) for commissions for money secured by him for its use, and in a sum equal to the difference between the cost of repairs of the "Ferrocarril Agricola de Montzorongo" and the amount of the proceeds realized from the sale of bonds granted by the Mexican Government to aid in such repairs. It further stated that it was the object and purpose of the parties to that instrument "to provide for the final adjustment, settlement and extinguishment of all claims existing between them, and to secure the repayment to them respectively of their said advances," and after stating the capitalization of the Railroad Company and that Mason owned the $1,250,000 of common stock which was alloted to him "as his sole share in the profits" of the railroad enterprise, under the agreement of April, 1901, various covenants and agreements were entered into. Mason agreed to transfer and deliver the shares of the common stock to the Trust Company to be held by it for the purposes and uses of the agreement. The Trust Company declared that it held, and would hold, all the stocks and bonds of the Railroad Company which it already owned and held and those to be transferred to it by

Mason, as security for the repayment to itself and to Mason, *pari passu*, and without preference of one over the other, of their respective claims against the Railroad Company, to wit: the claim of the Trust Company for moneys advanced or to be advanced by it in furtherance of the construction, maintenance and operation of the railroad, including certain expenses mentioned, with interest at six per cent. per annum upon each of said advances from the date thereof, less such amounts as the Trust Company may have received upon said claims from sales of subsidy bonds or other sources *"and the claim of said Mason against said Vera Cruz and Pacific Railroad Company for the sum of fifty-five thousand dollars ($55,000.00) gold, advanced by him as aforesaid, with interest at six per cent. (6 per cent.) per annum."*

It is then agreed, after the payment of all said claims in full, with interest at six per cent per annum, to apply the balance, if any, remaining of the proceeds of the sale of securities to pay fifteen per cent to Mason and the remainder to the Trust Company. Provision was made for the sale, exchange, etc., of the securities and Art. 7 of the agreement provided as follows: "Notwithstanding anything in this agreement to the contrary, it is expressly understood that the Trust Company shall have the right to deliver to John S. Alexander four-ninths of the common stock of the Vera Cruz and Pacific Railroad Company to which said Mason was entitled as his share of the profits of the Vera Cruz and Pacific Railroad enterprise, provided the same be accepted by said Alexander in settlement and satisfaction of all his claims to share of said profits, and he give a proper release to said Mason, or his representatives."

Mason released the Trust Company and the Railroad Company, and each and every officer of those companies, from all claims of every description, acknowledged that he was fully satisfied, ratified, approved and confirmed all corporate acts theretofore taken by the directors and stockholders of the Railroad Company, and especially those relating to the issue of the securities, and the execution and recording of the mortgage securing the bonds. He further covenanted to cause

proper entries to be made upon the books of the Railroad Company to show the settlement and satisfaction of all his claims against the company.

He continued to be president of the Railroad Company until November 7th, 1902. Alexander testified that Mason never called on him for any services after December, 1898, refused to answer his letters and neither he nor the Trust Company gave him any information. On October 19th, 1903, John S. Gittings and Co. filed a bill in equity against the Trust Comgany alleging that they were creditors of it, that the company was indebted in large amounts, was greatly embarrassed and unable to meet the demands of its creditors and depositors; that it had a large amount of assets consisting of securities of various kinds, which had great value but were not marketable; that the creditors and depositors were demanding payment of the funds due them, and the company did not have sufficient funds to meet the demands and was in fact insolvent; that there was great danger that the assets of the company would be wasted and sold at great sacrifice, etc. They then prayed, first; That the Court fully administer as a trust fund all the property of said company and marshal the assets, ascertain the liens and priorities existing thereon, and enforce and decree the rights, liens and equities of the creditors and stockholders as the same might be fully ascertained and decreed by the Court; second, That a receiver or receivers be appointed to take possession and management of the assets, books and papers of the company, collect all debts due it and administer the same subject to the further order of the Court, until such time as it may be just and proper to sell said property, etc.; third, That at such time as may be found just and proper the property of the defendant company be required to be sold and the proceeds distributed; and for further relief.

The Trust Company filed an answer admitting the matters and facts set forth in the bill, referring especially to the stocks and bonds of the railroad in Mexico, consenting to the appointment of a receiver or receivers, with authority to administer the property and affairs of the defendant until an advan-

tageous sale and disposition of its property and assets could be effected, and consenting to the granting of such other relief as was prayed for in the bill.

An order was passed the same day (October 19th, 1903), appointing Allan McLane, receiver, with power and authority to take charge and possession of the goods, wares and merchandise, books, papers and effects of or belonging to the company, and to collect the outstanding debts due it, and the company its agents and attorneys were required to yield up and deliver to said receiver the goods, wares and merchandise, books, papers and effects of said company, subject nevertheless to the further order of the Court.

On December 18th, 1903, the receiver filed a petition, referring to the bonds and stocks of the railroad company which were held subject to the declaration of trust of March 14th, 1902, and quoting from it and asking for authority to purchase the securities. That petition also stated that Mason was indebted to the Trust Company in a sum far in excess of the $55,000 with interest provided for in said declaration of trust—that amount of indebtedness having been incurred since the execution of said declaration of trust. An order was passed according to the prayer of the petition.

On January 25th, 1904, the receiver reported that Mason was willing to relinquish his rights under Article 4 of the declaration of trust, requiring notice to him before sale, and to allow the Trust Company, or the receiver, to dispose of or borrow money upon the securities at any time without notice to him, and asked authority to execute an agreement with him which was filed with the petition. The Court so ordered, and an agreement was made reserving the rights of Mason in the securities and the proceeds of sale as they existed prior to the application of the receiver for authority to purchase the securities, providing that the receiver should account to Mason for the proceeds as provided in the declaration of trust, apply the proceeds to the reimbursement of the Trust Company, or its receiver, for advancements made, "and at the same time and equally and without preference to the reimbursement of said

Mason, his heirs, personal representatives, or assigns, of the sum of fifty-five thousand dollars ($55,000), with interest, as provided in said declaration of trust," etc.

After the appointment of the receiver, Alexander obtained access to the papers and was asserting his claim for his share of the stock allotted to Mason, and which was purchased by the Trust Company with knowledge of Alexander's rights. The receiver was anxious to sell the securities of the railroad company and negotiations were carried on with the appellant for his interest in the stock. On April 15th, 1904, the receiver filed a petition, in which he referred to the agreement between Mason and Alexander of May 3rd, 1898, and stated that the Trust Company was notified of it and that Mr. Bowdoin, its vice-president, and acting on its behalf, promised Alexander that the company would see that four-ninths of any profits that might be coming to Mason should be retained for his benefit, that the declaration of trust showed that 25 per cent of common stock had prior to the date of its execution been allotted to Mason as his share of the profits, of which Alexander had not been notified, that the whole of said 25 per cent of stock was in the hands of the receiver and that Alexander had presented his claim for four-ninths of said stock, alleging that he was entitled to it by virtue of the agreement between him and Mason, and the promise of the Trust Company to see that he received his share called for in the agreement. The receiver then stated that, after conferring with the various creditors of the Trust Company through their counsel, he was advised that it would be "most desirable" to have undisputed title to the entire capital stock of the Railroad Company, in case of negotiation for a sale and was advised to secure the relinquishment of Alexander's claim; that he had agreed with Alexander that if he would relinquish any claim he might have to the stock he would transfer to him the claim which the Trust Company and he, as receiver, had against Mason. The petition then states: "This balance due from said Mason on that account as shown by the reports of the experts is about $200,000, but said Mason will be entitled to

some credits on said account, and *so far as your receiver is ad-vised said Mason has no property from which said claim could be collected, except his interest under said declaration of trust and agreement of March 14th, 1902.*"

The same day the Court authorized the receiver to execute an agreement with Alexander, in accordance with the recommendations contained in the petition. The docket entries in the record also show that on that day (April 15th, 1904), the receiver reported a sale of all the securities of the Vera Cruz and Pacific Railroad, and the Court ratified and confirmed the sale—although it is stated by counsel that the report of sale and order of Court were not filed until a later period.   On April 22nd, 1904, an agreement was executed between Alexander and the receiver by which Alexander released his claim to interest, ownership or title in and to any stock of the Railroad Company and the receiver (who, the agreement stated, was authorized by order of the Court to make the agreement, and thereby bind the Trust Company) agreed that the company would in its own name, but at the expense of Alexander, set up any and every claim which the Trust Company or the Railroad Company had, or might have, against Mason against any claim which Mason might have against the Trust Company or Railroad Company, by reason of the contract of May 14th, 1902, to the sum of $55,000, and the interest thereon, and any profits thereunder which may be distributable or distributed to said Mason, "and so far as said claim against said Mason may be adjudged to set off or extinguish said claims made by him, the party of the second part (the receiver) agrees to pay to the party of the first part (Alexander) a sum or sums equal to or representing said set off or extinguishment out of the amount received by him from the sale of the securities of the Vera Cruz and Pacific Railroad Company or the sale of any securities which he may receive in exchange therefor."

It then provides that in the event said Mason did not intervene in the suit and make claim to the $55,000, and interest, or to any profits, he may claim under the agreement of March 14th, 1902, and the Trust Company set up the counter claim

thereinbefore agreed to be set up, "then such sum as the Court may adjudge to be payable out of the said fifty-five thousand dollars and interest and said profits to the Maryland Trust Company by reason of said counter claims, shall be paid to the said party of the first part." The agreement concludes by saying that it is made on the express understanding that Alexander claims title to a portion of the stock of the Railroad Company under agreement and understandings prior to March 14th, 1902, and not under that agreement; "he not knowing of said agreement until sometime after said agreement and never having acquiesced in or accepted the same; nor does he by this agreement release any claim he has or may have against said Mason."

The sale reported and confirmed on April 15th, 1904, of the securities of the Railroad Company was, so far as we can understand, to the Mexican Government for $5,000,000 payable in first mortgage four and one-half per cent gold bonds of the Railaoad Company and guaranteed by the Mexican Government, less certain deductions. The order of Court of September 29th, 1904, speaks of a sale for $6,000,000 to Speyer & Co. and the purchase money as $5,493,600, but the auditor's report shows the amount of sales to have been $5,000,000, and refers to the order of September 29th, 1904, and other papers. So we understand the amount to be the latter sum and that the bonds were sold at 91.56, realizing, including interest, $4,636,750 which was received by the receiver October 5th, 1904, as shown by the testimony of Mr. Marbury. From that there was deducted the sum of $1,013,862.58, including amounts which the receiver was required to pay under the agreement with the Mexican Government and various expenses.

On August 31st, 1904, Mason intervened in this case by filing a petition demanding an accounting with the Trust Company, etc. The Trust Company and the receiver filed a joint answer setting up their claims against Mason and alleging that the accounts of the experts showed that he had already received the entire $55,000 and was not entitled to any dividend,

but was indebted to the company.    On January 7th, 1905, the matter was referred to the auditor.    Testimony was taken, and the auditor's report and account were filed April 9th, 1906. The accounting was conducted largely by counsel for Alexander, though under the supervision and direction of the counsel for the receiver and Trust Company.    At the conclusion of the examination of Mason, a stipulation was entered into by which it was agreed amongst other things that the Trust Company should make no claim against Mason for any money advanced prior to April 12th, 1901, (when he was released as above stated), and he agreed to make no claim against the Trust Company or Railroad Company for disbursements made by him prior to that time.    It was agreed, however, that those stipulations should not be construed as depriving Mason of his right to claim the $55,000 and the profits on the Montzorongo improvements as mentioned in the agreement of March 14th, 1902, or to affect his waiver of any claim for commissions or his right to claim 15 per cent. profits, as set forth in that agreement.  It was also stipulated that certain accounts against Mason should be admitted as *prima facie* correct, subject to his right to show that any of the items were incorrect.

The auditor distributed in part 1 of the account to Mason $37,945.69 being a fraction of over 49 per cent. on the $55,000 with interest from March 1st, 1898, to October 5th, 1904, when the money was received from the bonds, and charged him in part 2 with $84,977.24 and made a note that the interest should be added from October 5th, 1904.    In part 3 the auditor stated an account between Alexander and the receiver by which he distributed to Alexander the dividend on the $55,000 and interest, with interest thereon at two per cent. (being the rate the receiver was getting) from October 5th, 1904, to April 5th, 1906, less unpaid costs of the proceedings making $38,025.26, and also the amount due and owing the Trust Company by Mason (over the above sum) on October 5th, 1904, together with interest from that date to April 5th, 1906, and also certain costs paid by Alexander.

Exceptions were filed to the audit by Mason, the Trust

Company and John S. Alexander. In those filed by the Trust Company no objection was made to the distribution on the principal of the $55,000 but the interest was excepted to. Apparently no objection was made at the hearing by the Trust Company to this claim—indeed it was said in the opinion of the Court, that it "does not press its exception beyond a protest against the allowance of interest upon the sum of $55,000; contending that interest should only be computed upon actual money advanced by Mason at various times, and not upon a bogus claim, though recognized to some extent in the declaration of trust," dated March 14th, 1902. The Court stated in the opinion that it would not allow that claim, and the Trust Company then filed, with leave of Court, amended exceptions objecting to its allowance. That was the first time during these proceedings the company questioned Alexander's right to the principal of this fund.

Alexander then filed a petition alleging that in the course of the proceedings, up to the time of the hearing of the exceptions, the validity of the claim as entitled to a dividend under the agreements was undisputed and unquestioned by counsel for any of the parties to the cause, and for that reason he did not take testimony in his own behalf before the auditor. He then set out his claim at length and prayed that the cause be remanded to the auditor with leave to the parties to take testimony. The Trust Company and Mason answered the petition objecting to the remanding of the cause, and on August 21st, 1906, the petition was dismissed. From that action of the Court an appeal was taken, which is one of those now before us.

Archibald A. Alexander then filed a petition alleging that his brother had assigned his claim to him as collateral security, asking leave to intervene as claimant and take testimony to establish the claim, etc. On November 16th, 1906, the Court passed a decree dismissing the petitions of the two Alexanders, overruling the exceptions filed by John S. Alexander and Mason and sustaining the amended exceptions of the Maryland Trust Company. The Court further decreed that the

claim of Mason for the $55,000, be disallowed and stricken out, that the amount allowed by way of dividends on said sum and subsequently transferred to John S. Alexander be disallowed and that the amount be paid over to the Trust Company, less the unpaid costs; that Mason pay to John S. Alexander, assignee of the claim of the Trust Company, the amount ascertained to be due by him, without crediting him with the said dividend to wit, $132,959.06 with interest from April 5th, 1906, and that the audit in other respects be ratified and confirmed.    The decree recited amongst other things that the contract between Alexander and the receiver "was heretofore fully authorized and approved by this Court, and is hereby expressly ratified and confirmed" but declared Alexander was not entitled to the dividend, but was entitled to the claim o the Trust Company against Mason.    Both of the Alexanders appealed from the decree and those two appeals, together with that of John S. Alexander from the order of August 21st, 1906, are now before us.

We have thus stated at such great length the material facts because, when thus collected from the record, they seem to us to conclusively answer the main questions presented for our consideration.    It must be borne in mind that this is a controversy between Alexander and the Trust Company, and not between Mason and that Company.    If we were merely called upon to determine whether Mason or the Company was entitled to this dividend an important inquiry would be whether he had been paid the $55,000 since the 14th of March, 1902, when it was admitted to be due.    It would, to say the least, be very doubtful whether we could refuse to allow him a distribution on it merely because we reached the conclusion that it was originally a bogus or invalid claim.    The agreement of March 14th, 1902, not only shows that the object and purpose of the parties to that instrument were to make a final adjustment and settlement of all claims existing between them, but Mason transferred $1,250,000 of common stock of the Railroad Company to the Trust Company *in trust* for the very purpose of having that stock, together with the other securi-

ties, used or disposed of to pay the Trust Company what was due it and to Mason this sum of $55,000, with interest, "*pari passu*, and without preference of one over the other of their respective claims against" the Railroad Company. It may be that the common stock had little or no market value, but it was apparently of considerable value to the Trust Company, as with such a large block of stock outstanding a sale of the other securities of the Railroad Company might have been prevented. Mr. Marbury, who succeeded in making the settlement, went to Mexico for the very purpose of settling this claim and others. He said in reference to it; "For purposes of settlement I was willing to concede the claim, but what the claim was for or the items of it, or anything of that kind I never inquired about. It was not material for the purposes of that settlement." As Mason also surrendered a claim of over half a million of dollars for commissions, besides the million and a quarter of stock, it would seem that Mr. Marbury might well have regarded this claim of $55,000 of comparatively little importance, if he accomplished a settlement. He was then acting for the company, and after the receiver was appointed we have seen that he was advised that "it would be most desirable to have undisputed title of the entire capital stock." It was said in *Hartle* v. *Stahl*, 27 Md. 157, that "To support a compromise, it is sufficient that the parties entering into it thought at the time there was a *bona fide* question between them, though it may eventually turn out there was in fact no such question." A mere forbearance to sue would present a different question, and in this case the agreement with reference to the $55,000 was for a valuable consideration.

But without pursuing that inquiry further, there can be no doubt that Alexander had a *bona fine* claim for four-ninths of the stock issued to Mason. The Trust Company not only knew of his claim, but its vice-president drew the contract, which was the basis of it, and its officers promised to keep him informed of any changes made. There was ample consideration to support the settlement between Alexander and the receiver,

and there is nothing to show that Alexander was attempting
to take any undue advantage of the receiver or the interests
he represented.   The equities were on his side.   He had
spent his time and money in aiding in the promotion of the
enterprise, and according to his brother's petition, which was
sworn to and filed in the case (although we do not accept it
as evidence), he used large amounts of money furnished by
his brother.    Whether that be true or not, the record shows
beyond question that John S. Alexander not only asserted
his claim as a *bona fide* one, but it was so regarded by the re-
ceiver and others connected with the Trust Company.   When
the receiver filed his petition with the Court, on April 15th,
1904, and the Court authorized the agreement to be made in
accordance with its recommendation, it cannot be doubted that
it was understood that the distribution to Mason, in accord-
ance with the Declaration of Trust of March 14th, 1902, was
to be paid and that Alexander was to get the benefit of it.
The receiver said in his petition that he was advised that
Mason had no property out of which the claim due by him
could be collected, except his interest under the Declaration
of Trust.   It cannot be supposed that Alexander would have
been willing, or the receiver expected him, to surrender his
interest in the stock for an indefinite amount against a man
from whom it could not be collected.   The agreement be-
tween Alexander and the receiver clearly meant that Alexan-
der should receive so much of the distribution on the $55,000,
as would not have to be paid to Mason by reason of the coun-
ter claim against him, or the extinguishment of this claim—
that is to say, if the distribution was, for example, $37,000
and the claim against Mason was adjudged to set off or ex-
tinguish that amount, the whole of that sum was to be paid to
Alexander, if less be so adjudged, then that much was to be
paid to Alexander and the balance to Mason, if he was still
entitled to it.   The claims of the Trust Company and the
Railroad Company against Mason were also agreed to be as-
signed to Alexander.

The validity, *vel non*, of the $55,000 claim cannot affect Alexan-

der. When the agreement of April 22nd, 1904, was made the receiver unquestionably regarded it as valid, but he also believed from the reports of the experts that there were valid counter claims against Mason, and as he believed they could not be made out of Mason, excepting to the extent of the dividend on the $55,000 claim, he doubtless deemed it proper and "most desirable" to agree to pay that to Alexander, in order to get rid of his claim for the four-ninths interest in the stock. The learned Judge who decided the case below was satisfied that the contract was a proper one and by his decree not only confirmed it, but undertook to enforce it in favor of Alexander to the extent of the claim against Mason, but being of the opinion that the claim of $55,000 was "invalid, unwarranted and fictitious" disallowed it. From what we have already said, it will be seen that we are of the opinion that he was in error in reference to that. The dividend *on that sum* with interest, however the claim itself be now regarded, was the real compensation for Alexander's surrender of his claim to the stock, and not merely a personal decree against Mason, which is apparently worthless, and could probably be settled by a sum of money sufficient to obtain his discharge in bankruptcy.

We have no doubt about the power of the receiver to enter into the agreement with Alexander. The decree appealed from expressly recognized it. As we have already indicated we think that the petition of the receiver of April 15th, 1904, shows that it was the intention of the receiver and Alexander that the latter was to have the benefit of so much of the dividend on the $55,000 claim as could be set off, or extinguished, and the Court expressly authorized the execution of an agreement in accordance with that petition. The decree of the Court now under review, which was passed by the same Judge who passed the order of April 15th, 1904, shows that he so understood the power given the receiver as it says, "Which contract was heretofore fully authorized and approved by this Court." But if there could be any doubt about that, this decree ratified and confirmed it and the Court undoubtedly had that power. 23 *Am. & Eng. Ency. of Law*, 1064.

The agreement was executed in good faith by the receiver and Alexander, and it was unquestionably for the benefit of the estate in the charge of the receiver, for if it had not been made it was possible that the sale of the securities of the Railroad Company could not have been consummated, or at least would have been so delayed as to cause the Trust Company, its creditors and all interested parties great loss. It is now too late to undo what was done by virtue of that agreement, as the stock was set free and doubtless delivered several years ago. There can be no question about the right of a receiver, with the sanction of the Court, to make such a contract. 23 *Am. & Eng. Ency. of Law*, 1066. If he could not, it would oftentimes cause great sacrifice to the interests he represented. The right of a receiver to compromise claims and suits with the sanction of the Court is very generally recognized. 23 *Am. & Eng. Ency. of Law*, 1080; *Alderson on Receivers*, sec. 365, etc.; *Beach on Receivers*, sec. 278.

Nor was it necessary, as contended by the appellee, to give the Trust Company notice of the proposed contract. We have stated above the prayers of the bill and the answer of the company. The Court undoubtedly had the right to authorize and confirm a sale of the stock, bonds, etc., and if every time a question such as that presented by Alexander's claim was raised, it was necessary to give the company notice and await its consent, or hear its objections, great loss to the estate would ensue. The company had by its answer consented to the sale of the securities and a distribution of the proceeds, as it expressly assented "to the granting of such other relief as is prayed in said bill of complaint," and one of the prayers of the bill was for the sale and distribution of the proceeds. Indeed it is difficult to understand how the Trust Company could have any standing in a Court of equity to make such an objection, under the circumstances disclosed by the record. It was not only acquainted with Alexander's claim before the receiver was appointed, and promised to keep him advised, but it permitted counsel for Alexander to appear in its name in support of this claim, which was doubtless done in pursu- .

ance of the agreement between the receiver and Alexander. Indeed the company was represented and taking active part throughout the proceedings and made no objection to the allowance of the principal of this claim until the intimation came from the Court that it ought not to be allowed.

We are therefore of the opinion that the distribution to Alexander on the $55,000 should have been allowed and confirmed. Without deeming it necessary to discuss the question, we think the report of the auditor gives sufficient reasons to justify the allowance of interest on that sum from March 1st, 1898—the time fixed by the auditor.

It was in the discretion of the Court below to refuse to permit Archibald A. Alexander to intervene and take testimony when he applied for leave to do so, and we will dismiss his appeal. If we had entertained it, we would have affirmed the action of the Court, as a party should not be permitted to remain out of the case of which he has knowledge until after it is decided against him, and then become a party and delay the final settlement of it, unless he can show better reasons for so doing than this petition furnishes.

It is not necessary to determine whether the petition of John S. Alexander to remand the cause should be reviewed by us. Ordinarily such questions are in the discretion of the Court, but if a party to a cause (either of record or appearing through another) is misled by the conduct of the other parties, and for that reason failed to take testimony, or do other acts which he would otherwise have done, the Court should see that he is not prejudiced thereby. In this case the Court was doubtless of the opinion that nothing could be accomplished by remanding the cause, by reason of the conclusion he had reached as to the $55,000 claim. But as it was not necessary to take two appeals to protect his rights, we will dismiss the first one of John S. Alexander, assuming that to be the one taken from the order of August 21st, 1906. We will direct the costs in this Court, including the transcript and printing of the record and the briefs filed by John S. Alexander and the Maryland Trust Company, to be taxed in No. 51 (office docket),

and to be paid by the appellee, the costs in Nos. 50 and 52 (office docket) to be paid by the respective appellants. We understand the costs below, connected with this contest, to have been disposed of by the audit, but if not the Court below can direct how they shall be paid. We will reverse the decree of the lower Court in so far as it changes the audit in reference to the claim of $55,000 and interest and remand the cause, in order that a decree be passed ratifying and confirming the audit as filed.

Appeals in Nos. 50 and 52 (office docket) dismissed, and decree reversed (in No. 51 office docket) in so far as it changed the audit in reference to the claim of $55,000 and interest, and cause remanded, in order that the audit may be ratified and confirmed as stated by the auditor. The costs of transcribing and printing the record and of the briefs filed for John S. Alexander and the Trust Company to be taxed in No. 51 (office docket) and the costs in that case in this Court to be paid by the appellee, those in Nos. 50 and 52 (office docket) to be paid by the respective appellants.