FRANCIS T. HOMER, MICHAEL SCHLOSS, MAR-
SHALL WINCHESTER, GEORGE WHITEFIELD
BETTS, JR., AND E. CLAY TIMANUS, Committee,
vs. BALTIMORE REFRIGERATING AND HEAT-
ING COMPANY et al.

*Heating and refrigerating companies: public service corpora-
tions; bankrupt; lien of current supply creditors.*

Where a receiver, under an order of court, is operating the
plant of a bankrupt heating and refrigerating company, a
current supply creditor who furnishes coal to keep the plant a
going concern, has an equitable lien for his claim, as effective
against the ordinary unsecured creditor as it is against the
mortgagee.                                            p. 425

A heating and refrigerating company that uses the beds of
the streets of a city under a franchise therefrom for distrib-
uting through mains and pipes laid under the street the heat
to supply the public is a *quasi* public-service corporation.
                                                     p. 420

*Decided February 2nd, 1912.*

Appeal from Circuit Court No. 2 of Baltimore City
(STUMP, J.).

The cause was argued before BOYD, C. J., BRISCOE,
PEARCE, THOMAS, PATTISON, URNER and STOCKBRIDGE, JJ.

*Clarence K. Bowie,* for the appellant.

*Rignal W. Baldwin* and *Richard M. Duvall,* for the appel-
lees.

PEARCE, J., delivered the opinion of the Court (STOCK-BRIDGE, J., dissenting).

The Baltimore Refrigerating and Heating Company of Baltimore City is a corporation under the laws of Maryland, engaged in supplying heat in the business centre of Baltimore, and in conducting a large cold storage business in said city, and will be designated herein as the Heating Company.

On December 30th, 1908, Peter E. Tome, a creditor of said company upon an overdue promissory note of $1,000, and also the owner of 500 shares of the capital stock of said company of the par value of $100 each, filed a bill in the Circuit Court No. 2 of Baltimore City against said company, alleging those facts, and also alleging that it had an authorized capital stock of $1,000,000 divided into 10,000 shares, of which 7,612 had been issued; that said company on October 1st, 1902, executed and delivered to the Continental Trust Company, as trustee, a mortgage or deed of trust of all its property and accessories to secure 2,000 five per cent. bonds of said company for $1,000 each, of which number 1,300 had been issued, and that 1281 were still outstanding; that default had been made October 1st, 1908, in payment of interest coupons then due on said bonds; that the company was indebted to other creditors upon sundry claims, some of which were overdue, and others not yet due, and that it was without funds to pay any of such debts; that the company was a *public service corporation,* and that the obtaining of judgments and executions against it would endanger its bondholders, creditors and stockholders, and that it was necessary, in order to prevent this result, that a receiver or receivers be appointed to take charge of, *maintain and operate said plant* for the benefit of those entitled thereto, and for the performance of the duties *and obligations it owed the public*—and there was an appropriate prayer for relief. · The Heating Company answered the same day, admitting *all* the allegations of the bill, and consenting to the appointment of a receiver, as authorized by a resolution of the directors, and on the same day Peter E.

Tome with two others were appointed receivers. On January 16th, 1909, the Continental Trust Company, trustee intervened by petition, setting up its said mortgage, alleging its interest in the proceedings, and praying to be made a party plaintiff, and it was so ordered. On January 12th, 1909, the receivers upon their petition, setting forth the necessity at that season of the year of supplying the public with the steam heat for which it had contracted, and to enable it to maintain the low temperature within their large cold storage houses necessary for the preservation of the merchandise stored therein, were authorized and directed to continue all the branches of its business under the direction of the Court and until its further order. On January 27th, 1909, R. Lee Jones filed a petition in the cause alleging that the Heating Company was indebted unto him in the sum of $2,778.64 for coal supplied by him between December 1st and December 30th, 1908, and used during that period; that the receivers had then in hand about $10,000 received by them for earnings for December, 1908, none of which could have been earned but for the use of said coal, and that he had a just claim to be paid therefore out of said earnings, and prayed an order for such payment, and an order *nisi* was passed the same day.

On February 10th, 1909, the receivers answered this petition admitting they had made collections for December, 1908, but alleging that these would be required to pay operating expenses and make such repairs and additions to the machinery and premises as would enable them to run the plant successfully. They call for strict proof of the petioners claim, and allege that in any event it was an unsecured account, and should not be preferred to other general creditors. On February 16th, 1909, Jones filed an amended petition setting forth his claim with more particularity, and alleging that since the previous July a committee of bondholders had been in charge of all the financial affairs of the company; that this coal was used for their benefit by enabling them to continue the operation of the plant and that it

would be inequitable to postpone his claim to the lien of said bonds.

On November 3rd, 1910, J. William Middendorf and Wilson P. Hayward, as a committee of said bondholders, together with Robert M. Spedden, a holder of 68 of said bonds, suing as well for themselves as all other bondholders who would come in, filed a bill in Circuit Court No. 2 of Baltimore City, against the heating company, its receivers, and Francis T. Homer and others, another committee of said bondholders, Richard B. Fentress and Continental Trust Company, trustee alleging the execution and delivery of the mortgage before mentioned and filing a copy thereof as an exhibit, together with copies of the two agreements under which said two committees of bondholders were constituted, showing that each of said committees were vested by the depositors of their bonds with full title to and ownership thereof for the purposes of said agreements.   The bill further recited the various transactions leading up to the then existing situation, praying among other things for an account of all outstanding bonds with the names of the lawful holders; that the Heating Company bring in the total amount found to be due thereon, and that in default thereof a sale of the Heating Company's property be decreed.   Answers were filed; that of the Homer Committee being filed November 29th, 1910, admitting all the material allegations of the bill as to the necessity of sale, but questioning whether the Continental Trust Company, trustee, was not incapacitated for the execution of the trust contained in the mortgage or was the proper trustee for appointment by decree of the Court, and on the same day, with leave of the Court—R. Lee Jones filed in that case a petition similar to that filed in the receivership case, setting up his claim and praying to be made a party thereto with leave to take testimony in support of his claim.   No order appears to have been passed thereon—but on December 7th, 1910, a decree was passed appointing the Continental Trust Company, trustee, to make the sale prayed, and on December 16th, Jones filed another petition in that cause, showing that

he had in the receivership case, obtained in 1909 an order to take testimony therein, but had not done so because he was led to believe by sundry bondholders that his claim would be adjusted without taking testimony in its support, and now asked leave to take such testimony to be used in either or both cases as might be desired; and an order was passed giving the leave asked, and referring the case to the auditor, before whom such testimony was taken.

The answer of the Continental Trust Company was filed after the decree of sale, viz.: On December 20th, 1910, but it requires no special notice as it alleged nothing in contravention of the necessity of the sale, and admitted the inability of the Heating Company to comply with its obligations either to its creditors or to the public.

It appears from the copy of the mortgage filed, that the Heating Company granted to the Continental Trust Company, not only its real and leasehold estates, but also "all rents, issues and profits thereof."

It appears from the testimony of Mr. Tome, one of the directors of the Heating Company, that on October 5th, 1908, after default in payment of interest on the bonds, that the directors prepared, with a view of reorganizing the company, an agreement between the holders of bonds and stock of the company to be known as depositors of the first part, the Fidelity Trust Company of Baltimore, depositary of the second part, and Mr. Tome with six others, as a committee of the third part, but it does not appear, what, if anything, was done thereunder. The Middendorf Committee was appointed by an agreement of April 26th, 1909, and the Homer Committee under an agreement of April 12th, 1909, but no readjustment was accomplished by either.

Mr. Tome testified that Mr. Wright was general manager in December, 1908, and had authority to purchase coal and approve the bills, and Mr. Wright testified upon examining the itemized bill of coal rendered by Mr. Jones that he supplied all the coal used in December, 1908, and that the bill was correct in weights and prices, and that no part of the

$2,778.64 had been paid.  He also testified that the receivers
purchased the negro school house mentioned in the proceed-
ings, for the storage of coal—for $12,000 which was paid for
out of the funds of the receivership; and that they installed
an elevator in the cold-storage building at a cost of $1,500,
and an additional brine cooler, and that these items were all
betterments, rendered necessary by the neglect of repairs and
improvements during 1907 and 1908.

Mr. Fonteneau, the bookkeeper of the Heating Company,
testified that the collections for January, 1909, were $17,-
900.17, of which 16,097.10 was earned in December, 1908,
from heat, ice and storage.

The property was sold under the decree mentioned for
$503,000. and the purchaser not complying, it was resold
under order of the Court for $261,000. On June 10th, 1911,
exceptions to the claim of R. Lee Jones were heard. and an
order was passed in the receivership case directing the
receivers to pay the same in full with interest from Jan-
uary 1st, 1909, and on the same day an order was passed
in the case where sale had been made, declaring that certain
net income received by said receivers had been diverted under
orders of the Court and expended in betterments to the prop-
erty which had been sold therewith; that said Jones' claim
should be paid out of any net income that had come into the
receivers' hands, and that to the extent of said claim. the
same should be made good out of the proceeds of said sale;
and ordering that until said claim should be paid by said
receivers, as directed by the order in their case, the Con-
tinental Trust Company, in the sale case, should retain in
its hands the amount diverted by said receivers.   This
order was so modified  on June 15th, 1911, as to require
the retention of only $4,000 dollars of the amount of net
income so diverted.

The Homer Committee representing certain of the bond-
holders secured by said mortgage have appealed both from
the order of June 10th, 1911, in the receivership case, direct-
ing the payment of the claim of R. Lee Jones and from the

order of June 15th, 1911, in the mortgage case directing the retention by the trustee of $4,000 for the protection of said claim. It will be seen from the foregoing statement of facts that this appeal presents a controversy between a mortgagee, as represented by the appellants, a committee of certain bond-holders secured by a mortgage, and a current supply creditor of the mortgagor, a corporation engaged in furnishing heat and refrigeration to the public in Baltimore City. It has been held in a series of decisions in the Supreme Court of the United States, at least as far back as *Fosdick* v. *Schall*, 99 U. S. 235, as well as in some of the State Courts, that when a Court of Chancery is asked by mortgagees of a railroad to appoint a receiver of the mortgaged property, pending proceedings for a foreclosure, the Court in the exercise of its sound judicial discretion may, as a condition of issuing the necessary order, impose such terms in reference to the payment from the receivership, of outstanding debts for labor, supplies, equipment or permanent improvement of the mortgaged property, as may under the circumstances of the particular case appear reasonable; some of the reasons for this rule are thus stated by CHIEF JUSTICE WAITE in *Fosdick* v. *Schall, supra*: "Where such companies become pecuniarily embarrassed, it frequently happens that debts for labor supplies, equipment and improvements are permitted to accumulate, in order that bonded interest may be paid, and a disastrous foreclosure be postponed, if not altogether avoided. In this way, the daily and monthly earnings which ordinarily should go to the daily and monthly expenses, are kept from those to whom in equity they belong, and are used to pay the mortgage debt." This is precisely what was done in the case before us, as was shown by the testimony of Mr. Wright, the manager of the Heating Company. The Chief Justice further said: "The income out of which the mortgagee is to be paid is the net income obtained by deducting from the gross earnings what is required for necessary operating and managing expenses, proper equipment and useful improvement. * * * If, for the convenience

of the moment something is taken from what may not improp-
erly be called *the current debt fund,* and put into that which
belongs to the mortgage creditors, it certainly is not inequit-
able for the Court, when asked by the mortgagees to take
possession of the future income, and hold it for· their bene-
fit, to require as the condition of such an order, that what is
due from the earnings to the amount of the debt fund, shall
be paid by the Court from the future current receipts before
anything derived from that source goes to the mortgagees.
In this way the Court will do what, if a receiver should
not be appointed, the company itself ought to do."

Accordingly in that case the receivers were required to
pay out of the funds in their hands for the rent of certain
cars during the time they were used by the company, before
the appointment of receivers, though the mortgage in that
case, as in this, gave a lien upon the income and profits of
the company.

In *Burnham* v. *Bowen,* 111 U. S. 776, it was held that
·debts contracted by a railroad corporation as part of neces-
·sary operating expenses (for fuel for example), the mort·
gage interest of the company being in arrear at the time. are,
privileged debts, entitled to be paid out of current income, if
the mortgagee trustees take possession, or if a receiver is
appointed in a foreclosure suit.   Also that if the current
income is diverted to the improvements of the property by
the trustees in possession, or by the receiver, and the mort·
gage is foreclosed without payment of such debts for operat-
ing expenses, an order should be made for their payment out
of the fund if the property is·sold, or if a strict foreclosure
is had they should be charged upon income after foreclosure.
In that case, CHIEF JUSTICE WAITE said: "We do not now
hold, any more than we did in *Fosdick* v. *Schall,* or in
*Huide Koper* v. *Locomotive Works,* 99 U. S. 258, that the
income of a railroad in the hands of a receiver for the benefit
of mortgage creditors who have a. lien on it, can be taken
away from them and used to pay the general creditors of the
road; all we then decided, and all we now decide, is, that if

current earnings are used for the benefit of mortgage creditors before current expenses are paid, the mortgage security is chargeable in equity with the restoration of the fund which has been thus improperly applied to their use." These cases have been followed in numerous decisions of the Supreme Court, such as *Kneeland* v. *Trust Co.*, 136 U. S. 89; *Va. Coal Co.* v. *Central R. R. Co.*, 170 U. S. 355, and *Southern R. W. Co.* v. *Carnegie Steel Company*, 176 U. S. 257. But it is urged that this doctrine has only been applied to rail-road corporation, citing *Woods* v. *Guarantee Trust Co.*, 128 U. S. 421. In that case the debt for which priority was claimed was for material used in the *construction* of a water-work, and JUSTICE LAMAR pointed out that this contention overlooked the vital distincton between a debt for construction and one for operating expenses as was established in *Cowdrey* v. *Galveston*, 93 U. S. 352. He also said: "The doctrine of *Fosdick* v. *Schall* has never yet been applied in any case except that of a railroad receiver. * * * There is a broad distinction between such a case and that of a purely private concern. We do not undertake to decide the question here but only to point it out." This was in 1888, nearly twenty-five years ago. The appellants here also cite in this connection *Hooper* v. *Central Trust Co.*, 81 Md. 559, and *Diamond Match Co.* v. *Taylor*, 83 Md. 394, for the general proposition that a receiver of a *private* corporation has no authority, even under an order of the Court, to create liens which will take precedence over subsisting incumbrances. In the former case the Ice Company was a purely private corporation engaged solely in the manufacture of ice, and in the latter the Match Company was a private partnership. In the former case JUDGE McSHERRY said: "The power to appoint receivers by no means includes authority in such instances to allow the creation of liens through the medium of receiver's certificates which will take priority over existing antecedent liens. * * * Instead of displacing mortgages and other liens upon the property of *private corporations* and *natural persons*, it is a duty of Courts to uphold and enforce them against all subsequent incumbrances;" and he

quoted the language of JUSTICE LAMAR, *supra*, but he did not pretend to *decide*, any more than did JUSTICE LAMAR that the doctrines ought never to be applied to any except railroad corporations. In 34 *Cyc.* 353, the author of the article says: "While it has been held that this is an extraordinary power, to be exercised only in cases of railroads, *and other like corporations of a quasi public character charged with a public duty,* for reasons peculiar to the property and not in cases of mere private concerns, yet in some cases it has been applied to property of a different character, used in the business of private individuals or corporations where the continuance of the business is necessary to preserve the property from waste, and in conserving the interests of those who may succeed in establishing their superior title."

In the case before us the Heating Company is at least *a quasi* public service corporation, using the beds of the streets of the city under a franchise therefrom, for distributing through mains and pipes laid under the streets the heat with which they supply the public through a large business section of the city. Chapter 108 of the Acts of 1910, creating the Public Service Commission, takes cognizance of "Heating and Refrigerating Companies," and defines that term as embracing "every corporation, association, company, joint stock company, or association, partnership and person, their lessees, trustees or receivers appointed by any Court whatever, owning, operating, managing or controlling any plant or property for manufacturing and distributing, and selling for distribution, or distributing, hot or cold water, steam or currents of hot or cold air for motive power, heating, cooking, refrigeration or for any public use or service in any city, town or village in this State."

In *Knickerbocker* v. *McKindley Coal Co.,* 172 Ill. 535, the Court said: "The fact that the authority of a receiver to incur indebtedness to keep the business a going concern until the final adjustment of affairs, is ordinarily exercised in receivership cases only, does not prevent the exercise of such authority in other cases when circumstances require it." In *Ellis* v. *Vernon Light and Water Co.,* 86 Texas,

109, the Court said: "It is urged that a Court of equity has no right in any case, other than a railroad receivership, to authorize a receiver to create an indebtedness and make it a charge upon the corpus of the estate with authority over a pre-existing mortgage, but we know of no rule or principle that would restrict the power to railway cases only. * * * It is contended that railroad corporations are organized for public purposes, with power to condemn private property, and that they owe a public duty which can only be discharged by continuous operation of their roads. * * * It is insisted this applies to no other case. * * * Such a power should be exercised with the greatest caution, but it can not be said it does not exist. * * * The rule is that the expense of administering and preserving the property is to be charged first upon the net income, and if that be not sufficient, then upon the property itself, or upon the proceeds of sale."

In *Peoples National Bank* v. *Va. Textile Co.,* 104 Va. 34, the Court said: "The general rule is conceded that the appointment of a receiver does not affect vested rights or interests of third persons in property which is the subject of recoivership, or disarrange the order of priority of existing liens. But this principle is subject to an exception as firmly established as the rule itself, namely, that where the receiver is appointed at the instance and for the benefit of the lien creditors, and charged with the duty of operating the property for their advantage, all proper charges, expenses and liabilities incurred, incident to the receivership are held to be a first charge, not only on the current earnings, but also on the corpus of the estate."

The three last cases referred to are cited by us only for the purpose of showing that State Courts of high reputation now hold distinctly that the equitable power exercised by the Court below and which is the exact subject of our consideration, ought not to be, and is not, restricted in its application to railroad corporations and we are not to be understood as citing them to show that the rule can be applied except as to net income earned before the appointment of a

receiver or a restoration of net income diverted by the receivers to betterments of the property, thus enhancing to the extent of the division the value of the mortgaged property. Beyond this, the precise question here involved, we intimate no opinion. But this extension of the rule in *Fosdick* v. *Schall* to other than R. R. corporations is not confined to the State Courts.

The case largely relied on by the appellants in their brief, *Atlantic Trust Co.* v. *Dana,* 128 Fed Rep. 209, supports precisely the position of the appellee in this case, it being held there that the rule was applicable to a water company as far only as to affect net earnings before the appointment of a receiver, though not extended to the corpus of the property except for the restoration of income diverted by the receivers. That case was decided in 1903, the opinion being delivered by JUDGE VANDERVANTER, now one of the justices of the Supreme Court of the United States. In a clear and strong opinion, it was there held that the trust company holding the mortgage, by its intervention in the receivership case (as in the case now before us), took the only effective way of asserting its rights under the mortgage; that such intervention was equivalent in effect to an entry and a demand for the income and profits, and effectually impounded for the mortgagee all income earned after the intervention; but that income earned before, though not collected by the receiver until after, must go to the current supply creditors who took the proper steps to secure it.

Again in *Atlantic Trust Company* v. *Woodbridge Canal and Irrigation Company,* 79 Fed. Rep. 39, JUDGE MCKENNA, who is also now a justice of the Supreme Court of the United States, said: "The Equitable Rules giving priority to labor supply claims arising within a limited time before the appointment of a railroad receiver in foreclosure proceedings, are applicable by analogy to irrigation companies which are also *quasi* public corporations. * * * The extension, however, is contended against, but I have no hesitation in

making it." This case was decided in 1897. In *Kellyn v. Carolina Mut. Telephone and Telegraph Co.,* 90 Fed Rep. 29. JUDGE SIMONTON applied the same rule to a telephone and telegraph company, which he said had never before been done. Apparently the controlling consideration with him, was the fact that these agencies are "important instruments of interstate commerce and furnish means of communication between all points on the globe," and "that they can exercise the right of eminent domain."

Nevertheless, the opinion is in line with those referred to above in which there was no right of eminent domain, and all these cases are significant of the steady extension of equitable principles to new conditions growing out of the constant development of new agencies for serving the public needs and promoting the public comfort and convenience. The rule was established in the first instance to protect as far as possible the weaker party against the advantage enjoyed by the stronger party through the aggregation of corporate power and wealth, and the extension of the rule which has been made is based upon the same beneficient and equitable considerations.

The ruling made in *Atlantic Trust Co. v. Dana, Supra,* was the same previously made in *Hook v. Bosworth,* 64 Fed. Rep. 443, where it was said: "Where a railroad mortgage contains a provision that until default, the mortgagor shall remain in possession, exercise its franchises and collect and use its revenues, a receiver appointed in a suit for foreclosure of the mortgage, the filing of the bill being the first demand for possession of the road, is not entitled to moneys earned prior to the demand, though not paid until after the appointment."

But it is contended that in Maryland, in *Clark v. Abbott,,* 1 Md. Ch. 474; *Barron v. Whiteside,* 89 Md. 448, and *Baker v. Hill,* 100 Md. 130, it has been held that a mortgagee after default and after notice to the tenants of the mortgagor, is entitled to the rents in arrear at the time of

notice as well as to those accruing thereafter, and that this case is thereby concluded, but we cannot accept this contention. Rent is incident to the reversion and the assignee of the reversion is entitled to rent falling due after the accrual of his title, though the tenant may have accepted an order for its payment before the title of the assignee of the reversion accrued. *Martin* v. *Martin*, 7 Md. 368. But there is a substantial distinction between rent, and income or profits.

That question was considered in *Gilman* v. *Ill. and Miss. Tel. Co.*, 91 U. S. 616, where JUSTICE SWAYNE said: "A mortgagor of real estate is not liable for rent while in possession. 2 *Kent's Comm.* 172. *He contracts to pay interest and not rent.*

In *Chiney* v. *Black*, 3 Douglass, 391, the mortgagor of a ship used for freight earned after the mortgage was given, but unpaid. Lord Mansfield said: "Until the mortgagee takes possession, the mortgagor is owner to all the world, and is entitled to all the profit made." It is clearly implied in these mortgages that the railroad company should hold possession and receive the earnings until the mortgagees should take possession, or the proper judicial authority should interpose. Possession draws after it the right to receive and apply the income. Mere possession would have been useless to all concerned. The right to apply enough of the income to operate the road will not be questioned. The amount to be so applied was within the discretion of the company. The same discretion extended to the surplus. It was for the company to decide what should be done with it. In this condition of things, the whole fund belonged to the company, and was subject to its control. *It was, therefore, liable to the creditors of the company as if the mortgages did not exist. They in no wise affected it.* If the mortgagees were not satisfied, they had the remedy in their own hands, and could at any moment invoke the aid of the law, or interpose themselves, without it; they did neither."

Moreover, the mortgage in this case, in express terms, provides that after default, the trustee might enter and operate the plant, "receiving all income and revenue and after deducting the expenses of use and operation * * * *shall* *apply the remaining net income and revenue* without preference, priority or distinction to one bond over another, to the payment of the bonds secured by the mortgage in the method and order prescribed therein." Finally it is contended that in any event the bondholders are entitled under the decisions in this State, to the extent of their deficiency, to share *pari passu* with the unsecured creditors in the distribution of the profits or earnings made before the intervention of the mortgagees. This is correct when invoked against those who are really unsecured creditors, and would be applicable here if Jones were still an unsecured creditor. He is taken out of that class of creditors (to which for example Mr. Tome belongs as respects his note for money loaned) by the rule giving a current supply creditor an equitable lien for coal furnished to keep the company a going concern, upon his application for that relief, and his equitable lien upon the earnings before intervention by the mortgagee, is as effective against ordinary unsecured creditors as it is against the mortgagee. It does not appear from anything in this record that there was any other liability on account of current expenses unprovided for when the receiver took possession— but if any other like claim should be presented it will be entitled to participate pro rata with the claim of Jones.

The orders appealed from will, therefore, be affirmed for the reasons stated.

> *Orders affirmed, with costs to the appellee above and below.*

Stockbridge, J.. *dissenting.*

———————

Upon the 29th day of February, 1912, the following order was passed modifying the order of February 2nd, 1912:

The petition of Francis T. Homer and others representing a committee of bondholders of the Baltimore Refrigerat-

ing and Heating Company for a modification of the order
affirming the two orders appealed from in this cause, and
passed on the second day of February, 1912, being read, it
is ordered this 29th day of February, 1912, that said order
be and the same is hereby modified in so far as it affirmed
the order of the Circuit Court No. 2, directing immediate
payment by the receivers of the claim of R. Lee Jones, and
that the receivers be and they are hereby directed to suspend
payment of said claim, until the statement and ratification
of an auditor's account distributing the special fund of
$12,013.74, in accordance with the opinion heretofore filed,
and the cause is hereby remanded for the statement of such
an account.