## COUNTY CORPORATION OF MARYLAND *v.* RAPHAEL SEMMES ET AL., RECEIVERS.

[No. 60, October Term, 1935.]

502

504

*Decided January 15th, 1936.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, and SHEHAN, JJ.

*Clarence W. Miles* and *Seymour O'Brien,* for the appellant.

*Thomas J. Tingley* and *George Farber,* for the appellees.

PARKE, J., delivered the opinion of the Court.

The problems on this appeal are of fact and of law. They arise on an appeal from an order overruling ex-

ceptions to an account stated by the receivers of a carrier of freight for hire in motor vehicles on specified routes between terminals on highways. The operation of the utility by the receivers was at a loss, and all the property, except some real estate and choses in action, were sold by the receivers, and the holder of a mortgage on all the tangible personal property and franchise was distributed, after an allowance of costs, expenses, and charges, the sum of $1,493.21 in part payment of the principal and interest of a mortgage debt which amounted to $10,480.85. The chief question of fact was what were the terms of an agreement between the receivers and the owner of the mortgage indebtedness, under which the owner agreed that the receivers might operate the lines of the utility and sell the mortgage property free of the mortgage lien. After the determination of this issue of fact, the main questions of law are: (1) What effect shall be given in this cause to the agreement as so found; (2) whether the exceptions are too indefinite in respect of one objection to be considered with reference to that objection; (3) whether the receivers are to be surcharged with the loss in operation, and, if so, for what period of control; (4) whether the commissions allowed to the receivers were excessive; and (5) whether the fee of counsel was not too large.

The Tidewater Lines, Inc., an incorporation of the State of Delaware, had been engaged for some years in carrying on in the State of Maryland, in the District of Columbia, and in certain adjoining sections of other states, the business of operating for hire motor trucks for the transportation of goods on the highways, between terminals which had been specified in the franchises which had been obtained from the several sovereignties. On May 2nd, 1933, a bill of complaint was filed, which alleged that, although the assets of the corporation exceeded its liabilities, it was unable to meet its debts as they became due in the usual course of its business. It was further averred that it was necessary for the protection of creditors that a receiver be appointed to take

charge of the assets, and administer and dispose of them under the jurisdiction of a court of equity. The defendant answered, admitting the allegations, and receivers were at once appointed to administer the corporate affairs under the supervision and direction of the court. The receivers qualified, and filed a petition which stated that it would be in the interests of the public and creditors to continue the operation of the corporation. The court thereupon authorized and directed the receivers to continue the operation of the business, subject to the further direction of the court. All these proceedings were had on the day that the suit was begun.

On the date of these proceedings, the corporation was indebted unto the County Corporation of Maryland, a banking corporation, in the principal sum of $9,550, which was secured by a mortgage deed of the debtor that was executed on the 1st day of June, 1928, and later duly assigned to the County Corporation of Maryland, which, for convenience, will hereafter be called "mortgagee." By this mortgage deed, the corporation granted and transferred as security (a) all of its real estate; (b) its good will, and its franchises, licenses, routes, and privileges which it had acquired or might subsequently acquire during the life of the mortgage deed; (c) its rolling stock of busses, trucks, and automobiles, together with all the accessories, tools, machinery, supplies, and equipment; and (d) its office furniture and fixtures, together with all personal property which the corporation might acquire during the subsistence of the mortgage and appropriated to the uses and purposes of its business, whether in addition to the mortgaged personalty or in substitution therefor; and with the privilege to the corporation to sell any article of such personalty that may become worn or useless, and to apply the proceeds of the sale to the purchase of other equipment for its use. In the event of a default in the payment of the debt, or in the performance of any agreement, covenant, or condition, the deed of mortgage authorized a public sale or a private sale, if the latter be at a price at least

sufficient to pay the mortgage obligation and the costs; and provided that out of the proceeds of sale there should be first paid the expenses of sale, which included a fee of $100 for the solicitor, and commissions to the party who might make the sale in an amount equal to the commissions allowed trustees for the sale of property under a decree of the Circuit Court for Charles County, where the principal office of the corporation was located.

The mortgagor was in default, and the right of the mortgagee to foreclose subsisted, but was held in abeyance as an effect of the court having taken custody of the mortgaged property. Since this power of sale was coupled with an interest in the property conveyed, and formed a part of the security afforded by the mortgage, and the mortgage purported to transfer all the corporate assets, except its cash and choses in action, it was a reasonable expectation that the court of equity in which the receivership was pending would have permitted a foreclosure under the power of sale in the mortgage. *Forest Lake Cemetery v. Baker,* 113 Md. 529, 538-540, 77 A. 853; *Berry v. Skinner,* 30 Md. 567; *Dill v. Satterfield,* 34 Md. 52, 54. Accordingly, the receivers promptly sought and obtained a relinquishment of the mortgagee's right to foreclose upon obtaining the sanction of the chancellor.

The parties agreed that, because of the nature of the corporate enterprise and of the promises made, it would be in the best interest of all the parties concerned that the mortgaged property should be sold by the receivers while it was in use for the corporate business of a public carrier. The surrender of the right of the mortgagee to foreclose was a valuable consideration moving from the mortgagee to the receivers, *qua* receivers. *Supra.* The parties, however, do not agree in respect to the promise or condition which induced the mortgagee to forego its right. It would be supererogation to set forth the analysis of the testimony by which the facts have been ascertained from the conflict in recollection of the witnesses, and the court will, therefore, state its conclusions, after

having given due weight to all the parol and written evidence.

At the time of the agreement, all the parties concerned knew that the corporation was insolvent, but the receivers were confident that the property mortgaged would be sufficient to pay in full the mortgage debt. The receivers accordingly promised to the mortgagee that, if they were permitted (1) to operate the corporate mortgaged property as a common carrier for an estimated period of sixty days, but never longer than the time when the expenses of operation should become greater than the current receipts; and, while so carrying on the transportation of goods, (2) to sell property of the corporation free of the mortgage debt, the receivers would pay the principal and interest of the mortgage debt to the mortgagee.

This agreement was made without the previous authorization or subsequent ratification of the chancellor, but the receivers, with the consent of the mortgagee, continued the transportation of goods; and for about sixty days their operations were profitable, but the ensuing two periods of thirty days were at so great a loss in each period that the net loss of operation for the entire period of about one hundred and twenty days was sufficient to absorb all former gains and to leave a net deficit of $6,607.91.

On May 26th, 1933, the receivers sold for $750 four trucks, and surrendered to the purchaser its franchise or permit to carry goods on certain highways of the state. A sale of all the remaining tangible and intangible property of the corporation, exclusive of the cash on hand, the bills, notes, accounts receivable, and the real estate, was made on July 28th, 1933, for $18,000, and confirmed by the court on August 24th, 1933. The receivers, also, sold for $400 a lot of land which was covered by the mortgage, and this money was paid direct to the mortgagee. The deposit of the corporation with the mortgagee was credited on the mortgage debt and reduced the amount due by $421.21.

In the latter part of August, 1933, the receivers and their attorneys filed separate petitions which respectively set forth in detail the services rendered, and the sum of $2,000 was thereupon awarded the receivers, and the sum of $3,500 was allowed to their two solicitors. At the time of these applications, the receivers and their attorneys believed that the operation of the receivers had resulted in a profit of approximately $3,500, and that there were in hand sufficient proceeds from the sales of the mortgaged property to pay the mortgage debt in full. The receivers did not know that they had been operating at a loss until October 1st, 1933, and the mortgagee had no intimation of this deficit until April, 1934.

The receivers filed on December 19th, 1933, their statement of cash receipts and disbursements for the period beginning on May 2nd, and ending on October 31st. The sum of their receipts was $90,916.21, and the aggregate of their disbursements was $86,919.94, which left on deposit the residue of $3,996.27. In February, 1935, the mortgagee filed its petition setting forth that the receivers had sold for an aggregate of $19,150 certain real and personal property which was subject to its mortgage lien, and that it was entitled to be paid out of this fund the mortgage debt, which, after all credits had been given, amounted to $10,344.89, with interest on $8,728.79 thereof from January 26th, 1935. The receivers resisted this relief, and testimony was taken, and the chancellor, by an interlocutory order, referred the cause to an auditor for the statement of an account.

Shortly after the filing of the auditor's report and account, the mortgagee filed its exceptions (1) to the allowance of the sum of $2,000 to the receivers in lieu of commissions; (2) to the allowance of the sum of $3,500 to the attorneys as counsel fee; and (3) to the allowance of any and all items of expense which were set forth in the account under the designation of "disbursements as per their voucher and report filed August 20, 1934," and which totaled $89,958.68, to the extent that the items thereof constitute expenses incurred by the re-

ceivers during the continuance of the business from May 2nd, 1933, to August 24th, 1933, in excess of an income of $69,545.35, as shown by the said account to have been produced by the operation of the business of the carriers by the receivers.

A common ground of every one of the exceptions is that the allowances are improperly made against the proceeds of sale of the mortgaged property, because of the agreement that the mortgage debt was to be paid in full. The additional ground of objection, that the allowances are excessive, is made against the compensation of the receivers and the fee of counsel.

The major exception is to the allowance to the receivers of the difference between $69,545.34, the income from the operation of the business by the receivers, and the disbursements, which amount to $89,958.68, to the extent that there is included in this difference any operating expenses of the receivers between May and August 24th.

The only other allowances, to make a grand total of $97,703.43, are:

Receivers, attorneys, court and auditor costs............$5,833.75
Claims of Mayor and City Council of Baltimore...    417.79
Balance to mortgagee on its mortgage claim..........  1,493.21

—————

$7,744.75

The sum of $89,958.68 embraced all other disbursements. It represented the addition of seventy-seven items, which, with few exceptions, had no reference to the time when the obligations were incurred, and were themselves the total of the expenditures which could be appropriately grouped under a general heading. The auditor stated that these allowances were all based upon the report of the receivers filed, with the supporting vouchers, in the cause on August 20th, 1934. The report is not in the record at bar. While it is obvious that the items must fall into at least two classes, the exceptions do not segregate nor identify the items which either constitute the expenses of operation, or are chargeable against the fund arising from the sale of the mortgaged

property. It is patent that some of the allowances are. chargeable against the proceeds of sale of the mortgaged property, and that others should be allocated to expenses of operation, but many of the items are of so equivocal an origin and nature that they are not susceptible of classification in the form presented by the record. The result is that the court is not afforded the data to ascertain what items should be charged as a preference against the earnings, and what should be charged against the proceeds of sale, and whether or not there has been a diversion of the income that should be given priority by reimbursement out of the proceeds of the mortgaged corpus. See *Gregg v. Metropolitan Trust Co.*, 197 U.S. 183, 25 S.Ct. 415, 49 L.Ed. 717; *Fletcher on Corporations*, vol. 8, sec. 5402, 5403; *Tardy's Smith on Receivers* (2nd Ed.), secs. 412-432; *Homer v. Balto. Refrigerating & Heating Co.*, 117 Md. 411, 417, 421, 84 A. 176; *Warburton v. Perkins*, 150 Md. 304, 310, 133 A. 141; *Hooper v. Central Trust Co.*, 81 Md. 559, 592, 593, 32 A. 505.

The authorities last cited plainly indicate the difficulties of the questions and the importance of the facts in their consideration and resolution. The exceptions are too general to aid the court, and the record does not enable it to supply the defects of the exceptions. Moreover, the exception must be clear, precise, and certain in respect of the allowance to which an objection is made. The objection should apprise the adverse party of what he will be called on to defend, and neither the chancellor nor the appellate court should be compelled to perform the office of an auditor in the examination of the record. *Miller's Equity Proc.*, sec. 545; *Scrivener's Admr. v. Scrivener's Excrs.*, 1 H. & J. 743, 747; *Norwood v. Norwood*, 2 Bland, 471, 481, note; *Burroughs v. Bunnell*, 70 Md. 18, 28, 16 A. 447; *Young v. Omohundro*, 69 Md. 424, 431, 432, 16 A. 120; *Grove v. Todd*, 45 Md. 252, 256; *Tardy's Smith on Receivers* (2nd Ed.), page 1709, sec. 610.

The vagueness of the exceptions in the respect mentioned will, therefore, limit the inquiry to two grounds

of objection. The first is that the mortgage debt should have been allowed in full, and the compensation to the receivers and the fee to the solicitors should have been rejected as against the mortgagee, on the ground that the receivers and the mortgagees had agreed that the mortgage debt would be paid in full. The second ground is that the recompense allowed to the receivers and solicitors was excessive.

1. After the decree assuming jurisdiction and appointing the receivers, the assets and affairs of the corporation were in the custody and control of the chancellor. The receivers were the representatives of the court, and were without the authority or power to enter into a contract with reference to the corporate assets or management without the prior authorization or subsequent sanction of the court that had assumed jurisdiction of the property and administration of the affairs of the corporation. Any one who either transacted any matter or attempted to contract with the receivers was charged with this knowledge, and, so, assumed all the risks of the undertaking. Here the terms of the contract were agreed, but these terms were neither authorized nor approved, and so, having no power, the receivers were without the capacity, to make a valid contract with the mortgagee that his mortgage debt would be paid in full, in consideration of the mortgagee foregoing its right to foreclose, if the court would assent, and to let the receivers sell the mortgaged corporate property clear of the mortgage lien. *Tardy's Smith on Receivers* (2nd Ed.), pp. 267-269; *Zielian v. Balto. Plant Ice Co.*, 115 Md. 658, 667, 81 A. 22; *Alexander v. Maryland Trust Co.*, 106 Md. 170, 66 A. 836.

The mortgagee, however, permitted the mortgaged property to be sold by the receivers pursuant to the terms of this purported contract, and the receivers reaped the full benefit of the contract, which the receivers, on their part, decline to perform according to its terms. Having enjoyed the benefits of the contract, a court of equity, although not having authorized the contract in the beginning, nor yet having subsequently ratified it, would,

nevertheless, accept as binding such terms of the contract as it would have approved when the obligations of the contract were originally formulated. *Tardy's Smith on Receivers* (2nd Ed.), p. 1714; *Alexander v. Maryland Trust Co.*, 106 Md. 170, 66 A. 836; *Farmers' Loan & Trust Co. v. Newman*, 127 U.S. 649, 8 S.Ct. 1364, 32 L.Ed. 303. The term that the mortgagee should be paid its mortgage debt in full, no matter what would be the amount received for the mortgaged property, was unreasonable and inequitable. No one could estimate within a fair degree of accuracy what the proceeds of sale of the mortgaged property would be, and, however fair the prospect, it was but simple justice and equity that the mortgagee have no other advantage above other creditors than what was its right under the mortgage deed. So, the undertaking to pay the full mortgage debt must be restricted to the mortgagee's preferential claim to the proceeds of sale of the property covered by the mortgage deed, after a deduction of the charges and expenses rightly apportioned.

The corporation was a common carrier of freight upon certain highways under license from the State. It would be conducive to a sale under more advantageous circumstances if the tangible assets of the corporation could, in connection with its franchises or licenses, be sold as a going business. It was, consequently, sound judgment for the receivers to carry on the operations of the corporation so long as the expenses of operation did not exceed the receipts. The mortgage debt was a capital charge, and so soon as the expenses of operation were in excess of the earnings, a continuation would be a progressive impairment of the capital, and, generally prejudicial to all corporate creditors. Hence, it was a prudent limitation for the receivers to agree that they would not continue the operation as a common carrier beyond the time it was profitable. The public carrier in the pending cause was not a railway system in exclusive operation over its privately owned right of way, but a transportation line with motor vehicles engaged in the

carriage for hire of freight between specified terminals upon certain public highways by virtue of a revocable license granted by the state. The service so rendered to the public by such a motor vehicle corporation could be more quickly and certainly supplied, and with less inconvenience to the public, by another similar and substituted carrier than in the case of a carrier transporting goods upon a privately owned railway system. So, there was no compelling reason of public concern for the motor vehicle line in the instant appeal to continue indefinitely in operation at a constant loss. The circumstances did not justify the court in contemplating other than an expedient and temporary operation. Compare *Homer v. Balto. Refrigerating & Heating Co.,* 117 Md. 411, 84 A. 176; *Parlett Co-operative v. Tidewater Lines, Inc.,* 164 Md. 405, 165 A. 313; *Public Service Commn. v. Williams,* 166 Md. 277, 170 A. 517; *Public Service Commn. v. Philadelphia, B. & W. R. Co.,* 122 Md. 438, 89 A. 726; *Benson v. Pub. Serv. Commn.,* 141 Md. 398, 403, 404, 118 A. 852; *Public Service Commn. v. Philadelphia, B. & W. R. Co.,* 155 Md. 104, 120, 141 A. 509.

Applying the principle that equity regards as having been done what it would have declared should be done, if its order had been duly requested, in accordance with orderly practice in proceedings in receivership, the rights and liabilities of the mortgagee will be ascertained and adjudged on this record upon the assumption (a) that the receivers were to continue the corporate affairs as a common carrier for a tentative period of sixty days, and no longer than its receipts were in excess of the expenses of operation; (b) that the receivers were to sell, as soon as could be done, the property of the carrier free of the lien of the mortgage; and (c) that the proceeds of the sale of the corporate assets which were subject to the mortgage, less the proper charges, would constitute a fund which should be first applied to the payment of the principal and interest of the mortgage debt. See *Alexander v. Maryland Trust Co.,* 106 Md. 170, 66 A. 836; *Farmers' Loan & Trust Co. v. Newman,* 127 U.S.

649, 8 S.Ct. 1364, 32 L.Ed. 303; *Brown v. Hazlehurst*, 54 Md. 26, 28; *Abell v. Brown*, 55 Md. 217, 226; *McCrory v. Beeler*, 155 Md. 456, 461, 142 A. 587; *Forest Lake Cemetery v. Baker*, 113 Md. 529, 538-540, 77 A. 853.

Considering the matter from the standpoint of operation, the first thirty days of their management of the affairs of the carrier were profitable ($2,846.10), but the second like period was fifty-nine per centum ($1,156.42) less profitable than the preceding period. The third period of thirty days was at a loss of $1,109.58, and the final monthly period was at a cumulatively greater loss of $9,500.85, so that the total loss in operation was finally ascertained to be $6,607.91. The receivers testified that they did not discover that they had been operating at a loss until about the following October 1st. The reason assigned for this failure to know such a vital fact was that on September 1st, when the new purchasers assumed control, the receivers discharged all but one employee, who did not conclude his computations of their financial position until around the 1st of October. The answer to that would seem to be that their chief concern was with the financial result of their operations, and all during this period they had their complement of clerical force. Their ignorance of the affairs of the carrier is attested by the facts that on August 24th and 28th the attorneys and receivers were allowed $3,500 and $2,000, respectively, for their services to the dates of the orders which awarded the compensation; and, a few days later in the month, went to the mortgagee to complete the arrangements to pay in full the mortgage debt and interest, and the payment was not made, because the mortgagee would neither give credit in full for the deposit of the carrier with the mortgagee, as its financial reorganization contemplated a payment of fifty per centum to its depositors, nor accept as cash the obligation of the purchasers to the receivers in the sum of $2,000.

This lack of knowledge is not excused if it were due to an absence of ordinary care and diligence on the part

of the receivers in the administration of the receivership. When a receiver acts as would an ordinarily prudent man in the management of his own affairs, he is not liable, but should he fail to exercise this degree of care and diligence, he will become answerable for losses to the property and assets in his charge in consequence of his neglect. *Perry on Trusts* (7th Ed.), secs. 401, 415, 441, 454, 598a; *Pomeroy's Equity Jurisprudence* (4th Ed.), sec 1638 (217); *Tardy's Smith on Receiverships* (2nd Ed.), pp. 199, 244, 245; *Caldwell v. Graham,* 115 Md. 122, 128-130, 80 A. 839.

The carrier was insolvent. The receivers were appointed because of its financial condition. Under the circumstances, there could have been no reasonable expectation that the receivers could so lessen the expenses and increase the business and receipts as to assure a constant monthly excess of operating receipts over operating expenditures. The immediate past warned the receivers to expect a monthly deficit. Frequent statements of the financial result were necessary to an intelligent and prudent control. These statements could have been procured and should have been obtained at short and regular intervals. Without these statements or an equivalent knowledge which had been obtained from the books and records kept of the transactions of the receivership, the receivers were not proceeding with that degree of care and diligence which an ordinarily prudent business man would have exercised in the management of a similar business, whose capital assets would be progressively dissipated if its operating expenses should exceed the operating receipts. The information was not only requisite for an intelligent and careful administration, but was also indispensable to the performance of the agreement of the receivers with the mortgagee that, so soon as the operating income was insufficient to meet the operating expenses, the receivers would cease carrying on the transportation of goods by the truck lines. The receivers should have obtained at the close of every fortnight its net operating income. There is no reasonable

and sufficient explanation afforded why the receivers did not know at the end of June the alarming decrease in income, and by the middle and at the last of July, the deficiency which existed. It was the duty of the receivers to have possessed this knowledge, and, therefore, they are charged with the consequences of an ignorance which arose from their grave neglect. By reason of their failure in this regard, the receivers did not report the situation to the court for its advice and action. Furthermore, the sale of the franchises and all the tangible assets was made on July 25th, 1933, and reported to the court on July 28th, and, after the overruling of an exception, was finally ratified and confirmed on August 24th, 1933.

The corporation was a public utility, but the transportation for hire of goods of the public in motor vehicles, which are operated between fixed terminals, along designated routes, and on specified highways, under a permit from the Public Service Commission, is a service that was neither so exclusive nor so insusceptible of substitution within a reasonable time as would make its continuous operation a public necessity in a degree which would be comparable to the need of the public for the continuation of the service of a railway system, or of a utility engaged in supplying light, heat, or transportation over a private way. So, it would demand exigent conditions to justify a direction by the chancellor that the receivers should, pending the decision on the exception to the sale, continue to carry on the business of transportation at the sole risk of loss to the mortgagee. See *Tardy's Smith on Receivers* (2nd Ed.) sec. 385; *Union Trust Co. v. Curtis*, 182 Ind. 61, 105 N.E. 562, 566; *Farmers' Loan & Trust Co. v. Oregon Pac. R. Co.*, 31 Or. 237, 48 P. 706, 708; *Gasser v. Garden Bay R. Co.*, 205 Mich. 5, 171 N.W. 791, 797; *Atlantic Trust Co. v. Chapman*, 208 U.S. 360, 371, 377, 28 S.Ct. 406, 52 L.Ed. 528; *Brooks-Scanlon Co. v. Railroad Commission*, 251 U.S. 396, 40 S.Ct. 183, 64 L.Ed. 323; *Bullock v. State of Florida*, 254 U.S. 513, 41 S.Ct. 193, 65 L.Ed. 380; *Continental etc. Bank v. Muscatine etc.*

*Co.*, 202 Iowa, 579, 210 N.W. 787, 789; *Kneeland v. American Loan & Trust Co.*, 136 U.S. 89, 10 S.Ct. 950, 34 L.Ed. 379. The circumstances, moreover, argued a different result. The sale of the franchises and all the tangible assets was made on July 25th, 1933, and reported to the court on July 28th, and, after the overruling of the exceptions, the sale was finally ratified and confirmed on August 24th, 1933, and the purchasers assumed the operation of the lines on September 1st. The purchasers, however, contemplated the continued operation of the lines of the carrier by a similar corporation; and it was in their interest to get possession of the property and rights which they had agreed to buy, subject to the ratification of the court. The confirmation in equity of a sale is retroactive and commonly relates back to the day the sale was actually made. Upon a compliance with the terms of sale, the contract becomes complete, and the rights of the purchaser are ascertained with relation to the date of the sale. In case personalty is sold, the title vests, without actual delivery, in the buyer when the sale is confirmed and he pays the purchase money or complies, or offers to comply, with the terms of sale. *Scott v. Burch's Admx.*, 6 H. & J. 67; *Wagner v. Cohen*, 6 Gill. 97, 46 Am. Dec. 660; *Anderson v. Foulke*, 2 H. & G. 346; *Barnum v. Raborg*, 2 Md.Ch. 516; *Applegarth v. Russell*, 25 Md. 317; *Miller's Equity*, Proc. sec. 512; *Clark on Receivers* (2nd Ed.) vol. 1, sec. 523. So, the sale of the assets, together with the rights of the corporation to its permits or franchises, marked the beginning of a different stage in the administration of the receivership. The rights of the purchasers had intervened, and it could not have been reasonably maintained that the order of court, which was passed on the day the bill of complaint was filed, without the application for this action setting forth any information for the guidance of the chancellor, and which simply empowered the receivers to continue the operation of the business, subject to the further direction of the court, was an authorization that contemplated and, so, directed the receivers to operate the lines at the sole

risk of the estate, not only until the dismissal of the objections to the sale and the order of ratification, which was passed on August 24th, but until the 1st of September, when the purchasers took over the property bought. See *Brookfield v. Sharp*, 88 Md. 713, 715, 41 A. 1072; 68 *A.L.R.* 665, 666. It should have been evident to receivers and their counsel that further instructions from the chancellor were required for their direction. These considerations and the information of an accumulative deficit, resulting from the carrying on of the business by the receivers, if given to the chancellor, would have, in the absence of any paramount consideration, afforded the chancellor persuasive reasons either to discontinue the service or to direct its continuance either by the purchasers, or by the receivers for the purchasers, under such equitable provisions as would have been designed to prevent a further depletion of the assets between the day of the sale and its ratification or its rejection by the court. A cessation of operation by the receivers after a sale would not have produced a loss of the tangible property sold nor any material depreciation in its value. If the purchasers had preferred that the lines should continue to be operated, the chancellor could have imposed such terms and conditions as would have protected all interests in every contingency. *Clark on Receivers* (2nd Ed.) vol. 1, sec. 518. Since the chancellor was not made aware of a loss in operation, he could not advisedly supervise the course of the administration of the affairs of the utility. The failure of the receivers to know of the operative losses was chargeable to their neglect, and was the cause of their not seeking advice and direction of the court in respect of a course which, instead of conserving, was dissipating the capital resources. The mortgagee had the right to expect that the receivers would so manage the affairs that its assets would be preserved *(a)*. It further had the right to believe that the receivers would so keep or have kept accurate accounts of the utility that the receivers would know, or would be able to ascertain from these books and accounts and necessary and re-

quired reports and statements, the financial condition and results, from time to time, of their management of the utility *(b)*. The mortgagee, also, had the right to assume that, when it became apparent to the receivers that a continued operation of the carrier would be at the expense of the corpus of the estate, the receivers, in the exercise of the prudence and care which they must exercise in the performance of their trust, should at once report the matter to the chancellor's attention *(c)*. The general duty which was imposed upon the receivers in these particulars became a specific duty of the receivers by reason of their express promise to the mortgagee that they would not continue the operation of the carrier beyond the time its operation became unprofitable. *(a, c)* *Clark on Receivers* (2nd Ed.) vol. 1, sec. 396, pp. 544, 545; vol. 2, sec. 870, p. 1282; *(b) Perry on Trusts* (7th Ed.) sec. 821; *Clark on Receivers* (2nd Ed.) vol. 1, sec. 400, p. 549; *Lawson v. Burgee,* 131 Md. 436, 442, 443, 103 A. 516.

The receivers did not wait until all the assets had been converted and the distribution of the first account was ready for statement, but compensation for themselves and for their solicitors was requested and allowed the last week of August, 1933. The petition of the receivers for compensation gave a summary of the labors of the receivers and contained the statement that the operation of the property in receivership to August 28th, the date of the petition, showed an operating profit of approximately $3,500. The receivers did not know it, but it was their duty to have known that instead of a surplus there had been a substantial loss incurred; and they must be charged with that knowledge from such time as the knowledge could have been fairly imputed to them as a result of a failure to use proper care and due diligence. In respect to the duty of fiduciaries, the rule is firmly held that they are bound to keep clear, distinct, and accurate accounts so that they shall constantly know, or possess the means of knowing, the state of the administration of

their trust. *Supra. Lawson v. Burgee,* 131 Md. 436, 442, 443, 103 A. 516.

It remains to determine from what point in time should the knowledge of which they were negligently ignorant be imputed to the receivers. Since there was an apparent excess of income of operation over the expense of operation for the first two months, and since there was a sharp decline in the excess of receipts of the second month that was followed by a clear deficit for July, it would follow that by the 1st of August the receivers should have acquired knowledge of the deficit in operation, if they had but used in the discharge of their duties the ordinary care and prudence of the average man in a similar situation. The receivers, by their negligence, must be charged in the account with the loss of $9,500.85 in the operation of the lines of the corporation during the month of August and until the purchasers took actual possession and control. *Clark on Receivers* (2nd Ed.) vol. 1, sec. 641 (g), p. 889; vol. 2, sec. 613, pp. 1716, 1717; *Covington v. Hawes-LaAnna Co.,* 245 Pa. 73, 91 A. 514, 516, Ann.Cas. 1915D, 1254; *Higgins v. Shields,* 151 Ky. 227, 151 S.W. 391, cited in *Ann. Cas.* 1915D, 1256; *Harrison v. Boydell* (Eng.) 6 Sim. 211. The profits in operation for May and June were the sum of $4,002.52, but the loss for July was $1,109.58. If the month of August should be separated from other months and taken as the exclusive period for the finding of the loss for which the receivers would be liable, the surcharge would be $9,500.85, but, if the four months of operation should be made the unit of computation, the surcharge would be $6,607.91, or the excess of the expenditures over the receipts for that period.

It is true that the general rule is that a fiduciary does not benefit from the gains made in the management of his trust, and that the profits belong to the estate, and, so ordinarily, a gain by a trustee in one particular of his administration will not be suffered to reduce the loss caused by a breach of trust in connection with another and wholly unconnected matter. See *Lewin on Trusts,*

*907. However, the operation of the lines began pursuant to an order of the court, and was continuous throughout the period of the four months mentioned. The operating receipts were applied to the operating expenses, and, so, the loss or gain ensuing was not primarily a capital loss, but one in the income derived from the management of the lines of a public carrier. The profit and loss of transportation by the carrier would normally vary periodically throughout the term, but the nature of the undertaking was of a piece until the property was sold and the rights of the purchasers intervened. So, the income and expenses of operation determined the net loss or gain, and constituted a separate and distinct branch of the administration of the receivership. Again, the breach of trust was with reference to these operations. It was neither an act of moral turpitude, nor did it produce a break in the continuity of actual operations. The breach of trust was committed through ignorance of a fact which the receivers could with due diligence have ascertained. The breach was wholly related to the continuation of the operation of the utility as a public carrier, and marked the time when, in the exercise of such caution and diligence as would commonly be expected under the known facts and circumstances, a reasonably prudent person, who was in charge of the affairs of the utility, would, except through his default, have known of the actual financial loss then incurred and involved in the further operation of the business of public carrier; and would, in consequence of such knowledge, have submitted, before the 1st day of August, 1933, these facts to the court and requested its further direction in respect of a continuance of the operation of the lines at the expense of the corpus of the trust. With monthly gains and losses accruing in the same operative transactions in which no final accounting was taken until the close of the four-month period, and with the capital assets or corpus of the trust unaffected except to the extent of the deficit for the entire term of the operations, it would seem that this deficit of $6,607.91 should be the extent of the liability of the re-

ceivers, since it is the measure of the loss which the acts or omissions of the receivers have caused to the trust estate. See *Clark on Receivers* (2nd Ed.) sec. 641 (g), p. 889; *Fletcher v. Green,* 33 Beav. 426, 55 Eng. Reprint, 433; *Halsbury's Laws of England,* vol. 28, secs. 380-389, pp. 188-192; *Kennebec Box Co. v. O. S. Richards Corporation* (D.C. 1924) 299 Fed. 874.

2. The allowance of $2,000 to the receivers was excepted to as being excessive. The gross amount accounted for was $97,703.43, and the disbursements allowed made a total of $96,210.22, which represented the expenses of operation, liens for wages and taxes and costs and expenses of administration. The residue of $1,493.-21 was distributed to the mortgagee on account of its debt of $10,344.89, with interest on $8,728.79 thereof from January 26th, 1935. The gross receipts and disbursements were large, but a portion ($565.75) of the receipts was in bank, another portion ($8,312.33) were collections of past accounts from agents, debtors, and shippers, a third portion ($69,545.35) were receipts derived from the operation of the lines, and a final portion ($19,280) was the purchase price of the mortgaged property sold. The amounts paid out were largely for fixed operating charges, supplies, rent, insurance, equipment, notes, fees, commissions, and expenses incidental to the transportation and the receivership. The indications are that while the responsibility was that of the receivers, a large part of the work was performed by the agents of the receivers, and that the services of the receivers were largely supervisory, directory, and custodial.

The question of compensation has heretofore been considered by this court, and the case of *Tome & Hambleton v. King & Sterling,* 64 Md. 166, 181, 21 A. 279, is especially informative in this connection. There is, however, no invariable rule established for fixing the amount of compensation to receivers, and every case is determined according to its special circumstances, and the capacity, integrity, and responsibility required and employed. *Frock v. Columbian Construction Co.,* 141 Md. 413, 419,

121 A. 366; *Miller's Equity Proc.*, 659. So, the matter is within the sound discretion of the chancellor, whose judgment should generally not be disturbed. It may be said that the rate of compensation should vary according to the degree of difficulty or facility in the collection of different receipts, and that large sums of money easily collected should be at a low percentage. *Day v. Croft*, 2 Beav. 448, 492, 48 Eng. Reprint, 1271, 1272; 2 *Daniell, Chancery Practice* (6th An.Ed.) *1476; *Halsbury's Laws of England,* vol. 24, par. 771, p. 404; *Abell v. Brady*, 79 Md. 94, 98-101, 28 A. 817; *Miller's Eq. Proc.*, sec. 560; *National Bank v. Delaney*, 96 Md. 159, 176, 53 A. 944. In the appeal at bar the allowance was of a named amount. It does not appear from the record what were the rules of court, and, in the absence of any definite evidence to the contrary, it must be assumed that the sum named was according to these rules. Since the negligence of the receivers in respect of the prolonged operation of the utility was not of such a nature as to forfeit their right to any commissions, the chancellor committed no error in over-ruling the exception to their allowance.

The commissions of $2,000 allowed to the receivers must, however, be applied as a credit on the loss in operation of the lines of the carrier. See *Ehlen v. Baltimore,* 76 Md. 576, 579, 580, 25 A. 917. Where there has been an improper appropriation or payment of funds held in a fiduciary capacity, the loss must fall on the receivers who made the appropriation or payment, and not upon an innocent and prejudiced party. *Owings v. Rhodes,* 65 Md. 408, 416, 417, 9 A. 903; *Clark on Receivers,* vol. 1, sec. 419; *High Grade Brick Co. v. Amos,* 95 Md. 571, 594, 52 A. 582, 53 A. 148; *De Bearn v. Winans,* 111 Md. 434, 471, 473, 74 A. 626. See *Villere v. New Orleans Pure Milk Co.,* 122 La. 717, 48 So. 162.

3. The allowance to receivers of $3,500 to their counsel for their services from May 2nd, 1933, to August 24th was expressly made subject to the usual exceptions. When this amount was objected to as excessive and un-

lawful with reference to the proceeds of sale of the mortgaged property, the fees were limited to the specific period mentioned, but counsel agreed, when the question of its propriety was heard, that the amount should be regarded as in full compensation for all services whether past or future. There is not much more for the receivers to do in order to liquidate all the remaining assets, which consist of real estate and accounts receivable, whose value is estimated to be about $4,000. So, the amount allowed by the court must be regarded as full satisfaction, but the basis for the charge and the fairness in amount have to be determined from the nature and extent of the professional services rendered before the petition. It should further be observed that, while the charge is single, the two solicitors concerned were not employed for the same length of time. Thomas J. Tingley, Esquire, was, under an appointment made by the court on May 2nd, the sole solicitor of the receivers until July 15th, when George Farber, Esquire, was similarly named. The petition for fees was presented by both solicitors, and set forth in detail the work done. Three members of the Baltimore Bar certified that, after having read the petition and having conferred with the petitioners, they recommended the allowance of a fee of $3,500. Two of the signers testified in support of their certificate, as did Mr. Tingley. The exceptants offered no testimony. After considering the matter, the chancellor concluded that the fee asked was reasonable, and over-ruled the exception.

Although the solicitors filed the application in their own names, as is frequently done, it would have been more appropriate for the receiver to have filed the application, since the theory of the allowance is that the fees are part of the receiver's expenses. *High on Receivers*, sec. 805; *Stuart v. Boulware*, 133 U.S. 78, 10 S.Ct. 242, 33 L.Ed. 568; *Bowers v. Soper*, 148 Md. 695, 130 A. 330. While it is in the discretion of the court, the usual and better practice is for the court to fix the fees for the counsel of the receiver at the close of a receivership of brief duration, because it is usually not until

then that the administration of the receivership may be viewed as an entirety, the resources and liabilities may be ascertained, the nature, extent, and value of the legal services may be known, and the respective obligations of the parties and funds with respect to the apportionment and payment of the fees may be determined. *Clark on Receivers* (2nd Ed.) sec. 642; *Tardy's Smith on Receivers* (2nd Ed.) sec. 629.

It is the function of the court to fix the amount of fee to be awarded. In reaching its conclusion, the magnitude of the interests involved, the legal difficulties met, the length of time engaged, the skill and diligence displayed, and the practical result obtained by services rendered to the receiver and in the interest of the estate, are elements which, in connection with the other relevant facts and circumstances, must be well weighed by the court in order that a reasonable fee be allowed. The fundamental consideration, however, is that the compensation should be confined to work which was reasonably necessary for the proper administration of the trust. The decision of the court is presumptively correct, because of its opportunity to know or ascertain and estimate aright the value of the services, but its finding is subject to review on appeal, and will be reversed for clear and substantial error. *Great Nat. Ins. Co. v. Empire Fire Ins. Co.,* 165 Md. 510, 517, 518, 170 A. 165; *Taylor v. Denny,* 118 Md. 124, 133, 134, 84 A. 369; *O'Dunne v. Safe Deposit & Trust Co.,* 133 Md. 91, 104 A. 262; *Terminal Freezing & Heating Co. v. Whitelock,* 120 Md. 408, 414, 87 A. 820; *High on Receivers* (4th Ed.) sec. 805.

The allowance of a flat sum of $2,000 as commissions to the receivers serves to direct attention to the fact that the compensation granted for legal services to the receivers for the same period was $3,500, or seventy-five per centum more than the receivers were given. An examination of the detailed recital of the work done by the attorneys, which afforded the basis for the valuation made, fails to disclose that exceptional legal problems

were encountered, but does show that much of what was done was of a routine nature, and that several specifications related to services rendered the receivers rather than the estate and that the attorneys defended actions for torts which were pending for alleged wrongs of the utility that had been inflicted by negligence before the appointment of the receivers, and whose result was of no financial consequence in the affairs of the receivership nor of benefit to the mortgagee, since the assets were insufficient to meet the costs and expenses of administration and the lien of the mortgagee. See *Tardy's Smith on Receivers* (2nd Ed.) secs. 27, 30, 412; *High on Receivers* (4th Ed.) sec. 805; *Everett v. Neff*, 28 Md. 176, 186-189; *Estate of Rachael Colvin*, 4 Md.Ch. 126, 128-132; 8 *Fletcher, Cyclopedia of Corporations*, sec. 5341; *Emory v. Faith*, 113 Md. 253, 77 A. 386; *Forest Lake Cemetery v. Baker*, 113 Md. 529, 538, 539, 77 A. 853; *McDermott v. Crook*, 20 App.D.C. 465; *Decker v. Gardner*, 124 N.Y. 334, 26 N.E. 814; *Crawford v. Seattle etc. R. Co.*, 97 Wash. 651, 167 P. 44; *Gregg v. Metropolitan Trust Co.*, 197 U.S. 183, 25 S.Ct. 415, 49 L.Ed. 717.

When read in connection with the other facts of the record, the account of the auditor will disclose that the receipts and disbursements there classified had been collected and paid out to a large extent by the receivers or their subagents, and that they do not afford a basis for an inference that the aid of counsel had often been required. In view of the nature of the services, of the duration of the period during which they were rendered, of their necessity and the benefits and losses that inured to the estate from the advice which was apparently given, the chancellor was in error in not sustaining the exception to the allowance of $3,500 to the attorneys for the receivers. The fee was excessive, and for the professional services to April 29th, 1935, a fee of $1,000 should be allowed.

The effect of these conclusions is that the order overruling the exceptions is affirmed except in respect to the

amount of counsel fee allowed and the failure to sur-charge the receivers with the sum of $6,607.91. As a result, the account will stand as stated, except that the receivers will be surcharged with the sum of $6,607.91, the operating loss, making the total fund to be accounted for $104,311.34; that the counsel fee allowed will be $1,000, instead of $3,500; that the sum of $10,480.85, in full of the principal and interest of the mortgage debt to the date of the audit, April 29th, 1935, be distributed to the County Corporation of Maryland, and, finally, that the residue of $120.27 be distributed to the receivers to be held subject to the further order of the court.

> *Order affirmed in part and reversed in part, and cause remanded for the passage of a further order in conformity with this opinion; the costs to be paid out of the residue of $120.27 or such other funds as may hereafter come into the hands of the receivers.*